UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DANIELLE G.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK J. BISIGNANO, Commissioner of Social Security Administration,<br><br>Defendant. | ) | Case No. 3:25-cv-30146-CLM |

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR COURT REVIEW OF FINAL DECISION OF THE COMMISSIONER AND DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Docket Nos. 21 & 25)

MORGAN, U.S.M.J.

Danielle G. ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner denying her application for Social Security Disability Insurance benefits ("SSDI" or "disability benefits"). Plaintiff, who is proceeding pro se, contends that the decision of the Administrative Law Judge ("ALJ") was not supported by substantial evidence and seeks remand. Before the court are Plaintiff's motion for court review of the decision (Dkt. No. 21) and the Commissioner's motion for an order affirming the decision (Dkt. No. 25).

---

[1] In the interest of privacy, this Memorandum and Order uses only the first name and first initial of the last name of the non-governmental party in this case. *See S.R. v. Soc. Sec. Admin.*, Civil No. 24-12335-LTS, 2025 WL 815122, at *2 (D. Mass. Mar. 6, 2025) ("Use of [the] initial[ ] protects the claimant's privacy while still ensuring public access to the [c]ourt's reasoning and decision.").

The parties have consented to this court's jurisdiction (Dkt. No. 17). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the reasons set forth below, the court GRANTS the Plaintiff's motion (Dkt. No. 21), DENIES the Commissioner's motion (Dkt. No. 25), vacates the ALJ's decision, and remands the matter for further administrative proceedings consistent with this opinion.

## I. Procedural History

Plaintiff protectively filed for disability benefits on September 2, 2022, alleging a disability onset date of April 20, 2021 (A.R. 303-05).[2] Her claim was denied initially (A.R. 95-102, 122, 133) and on reconsideration (A.R. 109-19, 137). Plaintiff requested a hearing (A.R. 141-44), and ALJ Payam Danialzadeh held one on November 6, 2024 (A.R. 54-94). Thereafter, on December 12, 2024, and February 6, 2025, ALJ Danialzadeh sent Plaintiff notices advising her that he had received additional evidence—the first notice related to additional medical records and the second to responses to interrogatories from the vocational expert who testified at the hearing—and he proposed to enter them into the record (A.R. 399-400, 415-16). In each notice, ALJ Danialzadeh advised Plaintiff that she could request a supplemental hearing and that he would grant the request unless he issued a fully favorable decision (A.R. 399, 415). Each notice gave Plaintiff ten days to respond (A.R. 400, 416). There is no record of Plaintiff submitting a written response to

---

[2] All citations to "A.R." refer to the administrative record, which appears at docket number thirteen of this case. The page numbers were assigned by the Social Security Administration and appear in the lower righthand corner of each page.

either notice, although she received a Notice of Ways to Attend a Hearing form from the Office of Hearings Operations dated January 28, 2025 (A.R. 205-214). On February 20, 2025, the ALJ issued a decision denying Plaintiff's application for benefits (A.R. 8-33). Plaintiff requested Appeals Council review of the decision, which was rejected on February 28, 2025 (A.R. 1-5), rendering the decision final for purposes of judicial review under 42 U.S.C. § 405(g).

## II. The Record

### A. Plaintiff's Physical Medical Records

Plaintiff's claim is based on alleged limitations resulting from her physical health conditions, primarily affecting her right leg and left shoulder, as well as her mental health conditions. For ease of understanding and analysis, the court details the records relating to each separately.

#### 1. *Plaintiff's Right Leg*

On April 20, 2021, Plaintiff fell from her horse, injuring her right lower leg (A.R. 473). Plaintiff reported that April 20 was the first time she had left her home since her twin sister died unexpectedly in November 2020 (A.R. 484, 490, 965). X-rays taken at Cooley Dickinson Hospital revealed a comminuted right tibial plateau fracture and associated fibular fracture (A.R. 473, 483, 485). Plaintiff was transferred to Baystate Medical Center for orthopedic evaluation and treatment (A.R. 483, 488). In the early morning hours of April 21, 2021, Plaintiff developed compartment syndrome, requiring emergent surgical intervention (A.R. 481). Plaintiff underwent an emergency fasciotomy to address the pressure buildup, as

well as an open reduction and internal fixation to stabilize the tibial plateau fracture (A.R. 481, 491, 526-28). On April 23, 2021, Plaintiff had a non-excisional debridement of a hematoma and scrubbing of the site, followed by closure of the fasciotomy on April 26 and April 28, 2021 (A.R. 491-92, 529-34). Plaintiff was discharged from the hospital on April 30, 2021, with narcotic pain medications, a 28-day supply of injectable medication to prevent blood clots, and instructions to avoid weight bearing on her right leg (A.R. 492-95). Plaintiff returned to Baystate Medical Center on May 25, 2021, for a revision procedure including augmentation with a medial plate (A.R. 564-65). She was again provided with narcotic pain medications and instructed to limit her right leg to touchdown weight bearing or less for the ensuing six-week period (A.R. 572-73).

Six weeks after the revision procedure, Plaintiff met with Bennett Burns, M.D., of New England Orthopedic Surgeons for a follow-up examination (A.R. 705-06). Plaintiff was using crutches and wearing a leg brace (A.R. 706). Plaintiff told Dr. Burns that she was anxious to start weight bearing but also apprehensive about it (A.R. 705). Dr. Burns advised Plaintiff that she should advance weight bearing as tolerated and work on knee range of motion, which was limited to 0-50 degrees due to anterior tightness (A.R. 706).

Plaintiff met with Dr. Burns again on October 4, 2021 (A.R. 699-701). At the visit, Plaintiff was using a hinged knee brace and crutches (A.R. 699). She reported that she was putting about 75 pounds of weight on her injured leg, but beyond that, the leg felt unstable due to pain and weakness (*id.*). Plaintiff indicated that she was

experiencing pain anteriorly, including occasional sharp sensations (*id.*). Plaintiff had begun physical therapy and was working on a more heel-to-toe gait (*id.*). Upon examination, Plaintiff's surgical incisions and fasciotomy were healed and her knee range of motion had improved to 0-90 degrees (A.R. 700). Dr. Burns instructed Plaintiff to continue advancing weight bearing and encouraged her to start weaning off the brace (*id.*).

By December 23, 2021, when Plaintiff presented for physical therapy, she was ambulating weight bearing as tolerated with bilateral crutches but no brace (A.R. 582). She was "slowly improving" her stance time on her injured right leg, as well as her heel strike (*id.*). By January 28, 2022, however, Plaintiff's gait was increasingly antalgic and her stance increasingly valgus; she was laterally leaning on her left crutch for support (*id.*). Additionally, her initial contact with the ground with her right foot was flat footed (*id.*).

On February 1, 2022, Plaintiff returned to New England Orthopedic Surgeons with right knee pain, swelling, and a feeling of instability after she fell while walking with one crutch in her pasture one week earlier (A.R. 697-98). Plaintiff reported that she had been ambulating with only one crutch or a cane before the reinjury, but she returned to using two crutches (A.R. 697). Plaintiff was concerned she might have torn her anterior cruciate ligament ("ACL") (*id.*). Sofia Capua, PA-C, examined Plaintiff and noted mild swelling and knee range of motion of 0-120 degrees (*id.*). Plaintiff was able to perform a straight leg raise against resistance and gravity, exhibited full strength on knee flexion, and 4/5 strength on

knee extension (*id.*). Based on Plaintiff's examination, in particular her negative Lachman test result, PA-C Capua was confident that Plaintiff's ACL was intact (A.R. 698). She told Plaintiff she could continue to weight bear as tolerated and use two crutches until her knee no longer felt unstable, but she encouraged Plaintiff to work with physical therapy to get back to one crutch or a cane for ambulation (*id.*).

When Plaintiff next saw Dr. Burns on March 17, 2022, she reported no further problems with instability but described "more achy deep-seated pain" (A.R. 694). While Plaintiff reported that she was improving overall and was only using a cane outdoors, Dr. Burns observed that she was leaning "fairly heavily on [it] despite her assertions that she goes without it at home" (A.R. 694-95). Dr. Burns advised Plaintiff to continue working with PT on strengthening and stamina and gave her a prescription for a Genutrain knee brace (A.R. 695). Two days later, Plaintiff was noted in physical therapy to have a better heel strike and toe off when ambulating without an assistive device, although she still had some genu valgum and patellofemoral syndrome (A.R. 582).

On May 19, 2022, Plaintiff reported to Dr. Burns that a few weeks before, on April 27, 2022, she had stepped on a stick while walking down her driveway, rolled her ankle, and landed on her flexed right knee (A.R. 692). At that point, Plaintiff resumed using crutches and was seeing steady improvement until "the other day" when she felt a "sudden sharp pain in her knee, and had to limp back to sit down and apply ice," which "resolved [it]" (*id.*). Plaintiff presented with bilateral long arm crutches (A.R. 693). Upon examination, Dr. Burns observed mild tenderness to

Plaintiff's knee anteriorly underneath the patella (*id.*). He advised Plaintiff to "continue advancing activity as tolerated, bracing as needed, and may wean the crutches" (*id.*). He suggested she "focus on what motions tend to trigger the pain in her knee," due to the possibility that she sustained a meniscal injury or even an ACL injury that was not apparent during testing and where magnetic resonance imaging ("MRI") would be largely obscured by the metal in her leg (*id.*).

Plaintiff had seen her primary care provider, Marguerite Gump, M.D., one day earlier, on May 17, 2022, at 3:30 p.m., for depressive symptoms and significant concentration difficulties (A.R. 801-06). The medical record for the appointment lists Plaintiff as having a normal gait and station (A.R. 806). However, Plaintiff saw Pamela Brigham, LICSW, at 4:45 p.m., that same day and was noted to have a "noticeable limp (R leg)" (A.R. 797-800).

Plaintiff was next seen at New England Orthopedic Surgeons on July 14, 2022 (A.R. 690-91). Plaintiff was supposed to have followed up with Dr. Burns six weeks after her May 19, 2022, appointment, but "she state[d] that she was feeling good and canceled her appointment" (A.R. 690-91). However, two days after her canceled follow-up, "she began experiencing swelling in the right knee [and calf] with some pain," which decreased with icing and elevation (A.R. 690-91). According to Plaintiff, the pain was located to the lateral aspect of her knee and prolonged walking, standing, stairs, or bending was causing cracking, crunching, and pain in the knee (A.R. 690). PA-C Capua examined Plaintiff and noted that her gait was symmetric, and she was ambulating without assistive devices (*id.*). Plaintiff's

examination was normal except for mild tenderness along the lateral joint line of her right knee and positive patellar crepitus (*id.*). According to PA-C Capua's notes, she had a "somewhat lengthy discussion [with Plaintiff about] . . . posttraumatic arthritis as well as prolonged edema associated with the nature of her fracture . . . [and] patellofemoral syndrome," for which she gave Plaintiff a prescription for physical therapy (*id.*).

Plaintiff had a telemedicine appointment with Dr. Burns on January 23, 2023, because of a snowstorm and concerns about safely getting to and from his office (A.R. 823). Plaintiff reported difficulty getting the physical therapy for her patellofemoral syndrome scheduled because of her insurance (*id.*). Plaintiff advised Dr. Burns that over the previous two months she had been noticing that after standing for more than a few hours, her right leg, in particular her calf and shin, would swell for a few days before resolving (*id.*). "More recently she had a single episode [of] a round red swollen area in the anterior aspect of her shin which lasted about 3 days, and then resolved completely" (*id.*).

On May 23, 2023, Plaintiff met with Timothy Rice, PA-C, at New England Orthopedic Surgeons, reporting "increasing soreness about the knee over the course of the past couple of months" (A.R. 830). According to Plaintiff, she was having some difficulty with weight bearing," that it was getting "progressively worse," and that she was experiencing on-and-off swelling (*id.*). Upon examination, Plaintiff had mild tenderness over the medial and lateral hardware but no gross instability (*id.*). An x-ray showed mild arthritic change but no evidence of loosening or backing out of

hardware (*id.*). Plaintiff was sent for lab work to evaluate the possibility of infection (*id.*). She was still experiencing discomfort around her knee a month later. On June 20, 2023, she reported that her leg was bothering her; it was swelling and getting hot every night and some mornings, with an associated red hot nodule at times (A.R. 882). On June 26, 2023, she had tenderness to the medial and lateral knee joint line, and PA-C Rice administered a corticosteroid injection (A.R. 832).

When Plaintiff saw Dr. Burns on August 4, 2023, she reported that the injection provided relief for only one or two days (A.R. 834). She was still experiencing pain in her knee, was unable to kneel or garden, and noticed instability when pivoting on it (*id.*). According to Dr. Burns, "the even transient benefit from the injection suggest[s] that her symptoms are primarily intraarticular" (A.R. 835). While her x-rays did not reveal "overt or arthriti[c] findings, she certainly could have irregularity of the cartilage, [such as] flap like degeneration, but could also have meniscal tears" (*id.*). He again indicated that MRI could help provide information about Plaintiff's ACL or posterior cruciate ligament ("PCL"), but the amount of hardware in Plaintiff's leg precluded it (*id.*). Dr. Burns initiated the process for Plaintiff to get preapproval for gel injections and indicated that Plaintiff could also consider platelet rich plasma ("PRP") injections or having the hardware removed if she wanted to allow for imaging (*id.*).

On September 18, 2023, Plaintiff met again with PA-C Rice, who assessed her with osteoarthritis of the right knee (A.R. 840). PA-C Rice saw no signs of infection and no significant joint effusion (*id.*). Her calf was supple and nontender,

though she did have some discomfort with range of motion (*id.*). PA-C Rice administered Plaintiff's first gel injection during that visit (*id.*). Michael Cavanagh, PA-C, also with New England Orthopedic Surgeons, administered another gel injection one week later, on September 25, 2023, and another on October 13, 2023 (A.R. 841-42).

Plaintiff saw Francis Doyle, M.D., at New England Orthopedic Surgeons on November 15, 2023, at which time she reported waxing and waning swelling and erythema "nodules" earlier that week (A.R. 930). Upon examination, Dr. Doyle identified one "focal area over the proximal medial third of her tibia in the area of the distal extent of her plate on that side . . . [with] a small area of fluctuance approximately 1.5 cm in diameter and erythema," and her right lower extremity was "slightly swollen" as compared to her left (A.R. 930). Dr. Doyle assessed Plaintiff's symptoms as "concerning for a possible abscess and possible deep infection of the hardware," and ordered lab work and a computed tomography ("CT") scan (A.R. 930-31).

Plaintiff's lab test results were negative for infection but, by March 18, 2024, she had had two additional episodes of redness and swelling in her lower right leg lasting a week to ten days (A.R. 932, 1018). In addition, she was still reporting pain in her knee, in the anteromedial joint and centrally in the knee joint, that was aggravated by weight bearing activities (A.R. 1018). Plaintiff indicated that she felt less stability when going down stairs and was unable to kneel (*id.*). Plaintiff was ambulating without assistive devices but with a moderate right antalgic gait (*id.*).

Upon examination, Plaintiff had full range of motion with knee extension and no instability (*id.*). Dr. Burns again suggested that Plaintiff could consider PRP injections or hardware removal (*id.*). While the latter option would not address Plaintiff's intraarticular symptoms, it could relieve swelling that could be resulting from a bursa over the orthopedic plate or a low-grade infection at the site (*id.*). Hardware removal also would allow Dr. Burns to culture the site and enable MRI to further evaluate her cartilage (*id.*).

On October 3, 2024, Plaintiff was seen by Christopher Fields, PT, after having slipped on a hill with wet grass in early September, reinjuring her right leg, and being unable to put any weight on it by the following morning (A.R. 1090). Plaintiff reported that she was weaning from being non-weight bearing with bilateral axillary crutches due to pain and swelling (*id.*). She reported that she had been able to stop using crutches but was having a "shin splints" sensation in her right anterior lower leg (*id.*). Plaintiff reported being unable to be on her feet longer than two hours and was limping (*id.*). Upon examination, Plaintiff had dulled sensation and tingling to light touch at her right anterior lower leg and parts of her left leg (A.R. 1091). Fields determined that Plaintiff "would benefit from continuing to practice postural adjustment for pain control" (*id.*). Her improved symptoms since her injury suggested to Fields that "daily activities were continuing to provoke pain," and "[s]killed PT [wa]s reasonable and indicated to address exam findings and maximize safe pain-free level of function" (A.R. 1091).

2. *Plaintiff's Left Shoulder*

Plaintiff first reported an issue with her left shoulder during her August 4, 2023, appointment with Dr. Burns (A.R. 834-35). Plaintiff had "noticed a bump on her left shoulder, overlying the AC [i.e., acromioclavicular] joint" (A.R. 834). On examination, Dr. Burns noted that Plaintiff had a "palpable osteophyte on the distal clavicle at the AC joint" (A.R. 835). While Dr. Burns found no instability or prominence of the AC joint, it was tender (*id.*). Dr. Burns assessed Plaintiff as likely having some degree of AC joint arthritis and suggested it might be treatable with injections (*id.*).

A little over a month later, on September 11, 2023, Jennie Garver, M.D., of New England Orthopedic Surgeons, administered a cortisone injection to Plaintiff's shoulder (A.R. 838). During the appointment, Plaintiff advised Dr. Garver that she had been experiencing pain associated with her shoulder for approximately the last eight months to a year and that it was exacerbated by rotation on the back and across the body (A.R. 837). While Plaintiff's AC joint was tender to palpation, she had full strength with scaption, internal rotation, and external rotation (A.R. 837-38). X-rays revealed "[d]egenerative appearance of the AC joint," and a "[s]mall ossicle in the soft tissues superior to the mid acromion" (A.R. 838). Dr. Garver suggested the cortisone injection in the interim "to get a better sense of how much of her symptoms are coming from the AC joint versus the adjacent ossicle," but was of the opinion that Plaintiff would likely need a distal clavicle excision long term (*id.*).

Plaintiff reported that she found the September 11, 2023, cortisone injection helpful but by a December 1, 2023, appointment with PA-C Cavanagh, the pain had returned (A.R. 951). According to Plaintiff, the pain was exacerbated by overhead activity and sleeping on her left side (*id.*). PA-C Cavanagh found that Plaintiff had "mild bursal crepitance with mental [sic] manipulation [and] tenderness to palpation overlying the AC joint," which was exacerbated by cross body adduction, and he ordered an MRI (*id.*). The MRI was performed on December 7, 2023, and showed "[s]upraspinatus mild insertional tendinopathy with no evidence of rotator cuff tear;" "[m]ild diffuse edema within the teres minor muscle;" and "[m]ild bony proliferation acromioclavicular joint with surrounding bone marrow edema, which may reflect degenerative change or sequela of prior acromioclavicular joint injury" (A.R. 954).

On January 12, 2024, Plaintiff again met with PA-C Cavanagh for a preoperative evaluation for a left shoulder subacromial decompression ("SAD") combined with a distal clavicle excision ("DCE"), and possibly a "mini open excision of heterotopic bone off superior aspect of the acromion" (A.R. 994). On examination, Plaintiff had a positive impingement arc with bursal crepitance, her AC joint was severely tender to palpation, and she had very localized superficial bone within the subcutaneous tissue that was sensitive to light touch (A.R. 995). Plaintiff's rotator cuff strength with horizontal elevation and external rotation was slightly diminished at 4/5 (*id.*).

Plaintiff underwent the SAD/DCE surgery on January 17, 2024, with Dr. Garver (A.R. 998-1001). By August 27, 2024, Plaintiff's rotator cuff strength remained 4/5, but she was still producing a positive impingement arc and experiencing tenderness to palpation of the AC joint, exacerbated by cross body adduction (A.R. 1013). PA-C Cavanagh recommended another AC joint injection and a repeat MRI if she had no response (*id.*).

A November 7, 2024, MRI of Plaintiff's left shoulder showed a new linear partial delaminating-type tear of the supraspinatus, "with edema and tubular fluid signal at the myotendinous junction suggesting associated myotendinous strain" (A.R. 1023). Plaintiff met with PA-C Cavanagh on November 25, 2024, to review the results of the MRI (A.R. 1010). Plaintiff was reporting ongoing moderate discomfort (*id.*). Plaintiff indicated that she wanted to go forward with surgical booking for diagnostic arthroscopy inspection of the tear with possible repair with open distal clavicle excision (*id.*).

B. Plaintiff's Mental Health Records

After diagnosing Plaintiff with moderate recurrent major depression, posttraumatic stress disorder ("PTSD"), and anxiety (A.R. 824), and prescribing her hydroxyzine pamoate 25 mg as needed and bupropion HCL XL 150 mg thrice daily, Dr. Gump referred Plaintiff to Sharon Shumway, N.P., for further psychiatric treatment (A.R. 801-06).[3]

---

3 The psychiatric intake notes reflect that a Dr. John Anderson previously suspected Plaintiff had attention deficit hyperactivity disorder ("ADHD"), but she did not follow through on the evaluation process to receive a formal diagnosis (A.R.

Plaintiff first met with N.P. Shumway on May 20, 2022 (A.R. 792-96). At this appointment, Plaintiff reported "depressed mood, [an inability] to enjoy activities, sleep disturbances, loss of interest, concentration problems/forgetfulness, excessive guilt, fatigue, increased irritability, anger, excessive worry, and anxiety attacks" (A.R. 795). N.P. Shumway prescribed Plaintiff Adderall XR 20 mg and noted that she would continue taking bupropion at 300 mg (A.R. 796). At her next appointment with N.P. Shumway one week later, Plaintiff reported that she was "[d]oing better," was feeling "less debilitated by grief," and "more motivated to get up and do things that she has always enjoyed," like gardening and going to lunch with her mother (A.R. 787, 90).

On June 17, 2022, Plaintiff reported still experiencing a depressed mood, concentration problems/forgetfulness, fatigue, and excessive worry, but again reported feeling less irritable and more motivated (A.R. 780). Plaintiff was still taking Adderall XR 20 mg and bupropion HCL XL 300 mg and engaging in short term therapy with Pamela Brigham, LICSW (A.R. 778, 780. She reported a positive response to the medications (A.R. 780). Plaintiff's mental status examination was unremarkable (*id.*). N.P. Shumway increased Plaintiff's dose of Adderall to 25 mg, and Plaintiff was to reach out to area therapists for long term therapy, preferably Eye Movement Desensitization and Reprocessing ("EMDR") (A.R. 780-81).

---

796, 800). However, Plaintiff reported previously receiving an ADHD diagnosis while she was in nursing school (A.R. 795). It appears that N.P. Shumway diagnosed Plaintiff with ADHD on July 14, 2022 (A.R. 824).

Plaintiff saw N.P. Shumway for a follow-up appointment on July 14, 2022, at which Plaintiff did not report any notable changes in her symptoms (A.R. 770). She reported she was "doing well on Adderall 25 mg but fe[lt] that it possibly [wa]s not helping as well as it was" (*id.*). N.P. Shumway diagnosed Plaintiff with ADHD and increased her Adderall dose to 30 mg (A.R. 771, 824).

At her next follow-up with N.P. Shumway on August 16, 2022, Plaintiff reported that she was having more good days than bad, but was still suffering from concentration problems/forgetfulness, fatigue, and excessive worry (A.R. 766). Plaintiff was noted to be sad and tearful, but her mental status examination was otherwise unremarkable (*id.*). She thought that maybe her medications had "stopped working quite as well," so in addition to her 300 mg daily of bupropion, N.P. Shumway increased Plaintiff's dose of Adderall to 30 mg and added a 5 mg dose of dextroamphetamine-amphetamine at 3:00 p.m. daily (*id.*).

Plaintiff saw N.P. Shumway again on September 20, 2022 (A.R. 757-61). Plaintiff advised that she was still having more good days than bad (A.R. 761). She was doing better with the added 5 mg dose of dextroamphetamine-amphetamine at 3:00 p.m. (A.R. 758, 761). While she was still reporting concentration problems/forgetfulness, fatigue, and excessive worry, she was not feeling depressed, was less irritable, and was sleeping well, apart from some dreams about her sister and accompanying sadness (A.R. 761). She had not yet found a therapist (*id.*).

On January 26, 2023, Plaintiff met with Rebecca Craven, LICSW, for treatment of her PTSD symptoms at the request of Dr. Gump (A.R. 826-29).

Plaintiff identified the sources of her trauma as the loss of her twin sister, who she reported was murdered in November 2020 (although the medical examiner did not have enough evidence to say definitively that it was murder) and whose body she discovered, followed by the loss of two close friends shortly thereafter, as well as her April 2021 horseback riding accident (A.R. 827). Plaintiff reported several symptoms, including emotional dysregulation, dissociative symptoms, intrusive thoughts, emotional numbing, avoidance of trauma-related triggers, anger issues, hyperarousal, and sleep problems, as well as a history of panic attacks, persistent worry, and obsessive and catastrophic thinking (*id.*). Plaintiff also indicated that she experienced nocturnal panic attacks leading to non-refreshing sleep (*id.*). On mental status examination, Plaintiff was sad, anxious, and tearful, but her results were otherwise unremarkable (*id.*). Plaintiff noted that the bupropion was helping somewhat in that she was doing more day-to-day activities, having fewer flashbacks, and not constantly crying, but she still lacked motivation, felt empty, had trouble concentrating, and felt exhausted all the time (A.R. 829).

On March 7, 2023, Plaintiff met with N.P. Shumway again and reported that she had been feeling very tired and unmotivated since having a bad viral illness in January (A.R. 887). Her mental status examination was unremarkable (*id.*). Plaintiff's status was unchanged when she met with N.P. Shumway again on June 20, 2023, September 22, 2023, and October 6, 2023 (A.R. 862-866, 867-72, 878-83).

On April 24, 2024, Plaintiff met with John Novo, LMFT, for an intake for EMDR treatment (A.R. 1071-76). Plaintiff's mood was dysthymic and her affect

anxious and sad (A.R. 1075). During the meeting, Plaintiff "describe[d] frequent flashbacks of involved tearfulness and also hypervigilance and fear for the safety of herself and her loved ones" (A.R. 1076). Plaintiff reported that the flashbacks had "greatly reduced her ability to get out of the house" (*id.*). Plaintiff explained that she needed to renew her advanced lifesaving certificate but was avoiding doing so because it triggered memories of her trying to resuscitate her twin sister when she passed (*id.*).

Plaintiff met with Novo a number of times for treatment and was anxious and tearful at times (A.R. 966, 1056). Novo was not always able to proceed with EMDR processing because of Plaintiff's anxiety (A.R. 966, 1044-45). On June 26, 2024, Plaintiff advised Novo that she was still finding it difficult to be out in the world and that sometimes she would break down in tears when she encountered reminders of her sister (A.R. 1038-39). Novo noted that Plaintiff's PTSD and complicated grieving "interfere greatly with her ability to function" (A.R. 1039).

C. Psychological Evaluation

On January 20, 2023, Margaret Stephenson, Ph.D., met with Plaintiff and completed a consultative examination report (A.R. 818-20). According to Dr. Stephenson's report:

> [Plaintiff] reported depression, including dysphoric mood, uncontrollable crying spells, feelings of hopelessness and social withdrawal. She denied suicidal ideation. She reported excessive apprehension and worry about her family members, given the loss of her twin. She also reported daily flashbacks that are unpredictable and unexpected, of finding her sister unconscious and doing CPR. She reported experiencing flashbacks daily and

> experiences panic symptoms during the flashbacks, including palpitations, sweating, breathing difficulty, and shortness of breath. [Plaintiff] reported friends and socializing about monthly, and that an average day involves remaining in the home, caring for her dog, watching TV, attempting to do some light chores, and having to elevate and ice her leg several times daily (A.R. 819).

Dr. Stephenson administered a cognitive status exam, and Plaintiff scored in the average range on the attention, memory, language, calculations, and reasoning subscales (A.R. 820). Dr. Stephenson concluded that Plaintiff "is capable of understanding and following directions, maintaining attention and getting along with others" (*id.*).

D. <u>Opinions of State Agency Consultants</u>

1. *Physical Residual Functional Capacity*

On initial review of Plaintiff's application for disability benefits, Lisa Venkataraman, M.D., reviewed Plaintiff's medical records and completed a physical residual functional capacity ("RFC") assessment on January 16, 2023 (A.R. 99-102). Dr. Venkataraman determined that Plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds, engage in unlimited pushing or pulling with all her extremities, stand or walk about six hours in an eight-hour workday, and sit for the same length of time (A.R. 99-100). She opined that Plaintiff could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds, but could frequently balance, stoop, kneel, crouch, and crawl (*id.*). According to Dr. Venkataraman, Plaintiff had no manipulative, visual, or communicative limitations, but environmentally, she should avoid concentrated exposure to hazards, such as

machinery or heights (A.R. 99-100). Dr. Venkataraman's explanation for her opinion was that Plaintiff "walks with a normal gait and does not use an [assistive device]. She has mild tenderness and mild decrease in [range of motion] of the right knee" (A.R. 100).

On reconsideration on December 13, 2023, Elaine Hom, M.D., offered a different opinion as to Plaintiff's physical RFC (A.R. 114-17). Dr. Hom agreed with Dr. Venkataraman's lift and/or carry and stand/walk and sit limitations, but opined that Plaintiff should be limited to only occasionally pushing or pulling with her right leg (A.R. 115). In addition, Dr. Hom opined that Plaintiff should be limited to not only occasional climbing, but also occasional kneeling and crawling, as well as only occasional reaching overhead with her left arm (*id.*). By way of explanation, Dr. Hom offered that, as of August 2023, New England Orthopedic Surgeons' records reflected that Plaintiff was ambulating without assistive devices, albeit with "some [right] knee pain;" that her gait was normal on December 1, 2023; that she had some right knee pain but good range of motion in November 2023; and that her CT and lab results were normal with no evidence of infection (A.R. 116).

2. *Mental Residual Functional Capacity*

Douglas Hanze, Ph.D., completed the initial mental RFC on Plaintiff's application on February 4, 2023 (A.R. 95-98). Dr. Hanze found that Plaintiff was mildly limited in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself (A.R. 98). He relied on Dr. Stephenson's psychological evaluation report, as

well as the August 16, 2022, psychiatry treatment note that Plaintiff was taking Adderall and bupropion and was sad and tearful but otherwise within normal limits during a mental status examination (A.R. 98). Dr. Hanze found that Plaintiff had no mental work-related limitations (A.R. 100).

On reconsideration dated January 1, 2024, Brian McIntyre, Ph.D., opined that Plaintiff was mildly limited in understanding, remembering, or applying information and adapting or managing herself, but found that she was moderately limited in interacting with others and in concentrating, persisting, or maintaining pace (A.R. 113). In finding greater mental limitations than Dr. Hanze, Dr. McIntyre relied on Novo's medical encounter records noting "limitations . . . in terms of mental health to a moderate degree" (A.R. 114). He elaborated regarding Plaintiff's mental RFC that she "may have limitations with understanding and remembering detailed instructions," "may have difficulty carrying out detailed instructions and maintain[ing] concentration for extended periods of time," and "has the ability to interact with the general public, but may struggle to accept instructions and respond appropriately to criticism from supervisors" (A.R. 118)

E. Administrative Hearing

1. *Plaintiff's Testimony*

Plaintiff testified that she worked as a staff nurse at Cooley Dickinson Hospital before the death of her twin sister (A.R. 72-74). Plaintiff took family leave following her sister's death due to the mental toll it took on her (A.R. 74). According to Plaintiff's testimony, the first day she left her house after her sister's passing,

she was involved in an accident that left her bedbound for about a year (*id.*). Plaintiff received unemployment benefits for a few months but was eventually told that she would have to apply for disability benefits because of how long she had been out of work (*id.*). The ALJ inquired of Plaintiff as to what was physically limiting her ability to work the most, and she indicated that her right leg and left shoulder caused her the most pain (*id.*). Plaintiff testified that her right leg swells if she is on it for too long, but that if she sits for too long, it "gets really stiff," resulting in her knee giving out and buckling (*id.*). She testified that she was "recently off crutches," but indicated that "the slightest little jarring or slipping" results in "weeks of being on crutches again" (A.R. 74-75). According to Plaintiff, she spends every day trying to elevate the leg and apply ice wraps (A.R. 75). Plaintiff testified to experiencing "chronic pain [in the leg] all the time," with the only question being whether she has done "something that causes it to be worse" (A.R. 76). Plaintiff denied any relief from gels, anti-inflammatories, or physical therapy and explained that the situation is "just continuously . . . getting worse" (*id.*).

Regarding the limitations posed by her left shoulder impairment, Plaintiff testified that sometimes even a cup or mug is too much to lift with her left arm (A.R. 77-78). She explained that she cannot lift her left arm above her chest area and, as a result, she wears loose fitting tops so that she can pull them down over her hips and step out of them (A.R. 78).

Plaintiff testified that her mental condition was getting worse with the passage of time (A.R. 79). According to Plaintiff she had done some brief counseling

and tried different medication regimens, some of which "take the edge off a little bit" (*id.*). According to Plaintiff, she suffers from chronic sleep deprivation and struggles with concentration so much that she "can barely even hold a conversation with [her] family" (A.R. 80). Plaintiff indicated that she suffers debilitating daily flashbacks primarily reliving the experience of finding her twin sister and not being able to save her, as well as panic attacks that have made it impossible for her to drive or be in social settings (A.R. 80-81).

2. *Vocational Expert's Testimony*

The ALJ first asked Robert Paterwic, the vocational expert, to classify Plaintiff's past work experience under the Dictionary of Occupational Titles ("DOT"). Based on the documents and testimony provided by Plaintiff, the vocational expert opined that Plaintiff worked previously as a General Duty Nurse (DOT 075.364-010), with a DOT specific vocational preparation rating of 7, which is considered "skilled work," and an exertional level of medium (A.R. 84). However, because Plaintiff testified that on occasion she was required to lift as much as 100 pounds, the exertion level of the position as she performed it was heavy (A.R. 84).

The ALJ next posed certain hypothetical scenarios to the vocational expert. He asked the vocational expert to consider an individual of Plaintiff's age, education, and work experience, capable of performing light work; occasionally lifting and carrying ten to twenty pounds; sitting up to six hours in an eight-hour day; standing and/or walking up to four hours in an eight-hour workday; occasionally climbing ramps and stairs; occasionally stooping, kneeling, crouching,

and crawling; occasionally reaching overhead; frequently handling; frequently interacting with supervisors and/or coworkers; occasionally interacting with the public; and carrying out simple instructions; but who could never climb ladders, ropes, or scaffolds; never balance as defined in the Selected Characteristics of Occupations of the DOT; and never be exposed to hazards such as moving mechanical parts and high exposed places (A.R. 84-85). The vocational expert testified that such a hypothetical individual could not perform Plaintiff's past relevant work but could perform work as a Marker (DOT 209.587-034), with a DOT specific vocational preparation rating of 2 (which is considered "unskilled work") and an exertional level of light, with a "conservative estimate in the national economy [of] anywhere from 80,000 to 81,000 of these jobs;" a Mail Clerk (DOT 209.687-026), again with a DOT specific vocational preparation rating of 2 and an exertional level of light, with a "conservative estimate in the national economy [of] anywhere from 12,000 to 13,000 of these jobs;" and Office Helper (DOT 239.567-010), again with a DOT specific vocational preparation rating of 2 and an exertional level of light, with a "conservative estimate in the national economy [of] anywhere from 13,000 to 14,000 of these jobs" (A.R. 85-86). According to the expert, while not stated in the DOT, based on his professional experience and judgment, while these positions might require more than occasional reaching generally, they would not require more than occasional reaching overhead specifically, and the three jobs he identified would allow an individual to sit and stand to tolerance (A.R. 87-88). Finally, the expert testified that the DOT includes a marker for each position

regarding an employee's involvement with other people ranging from zero to eight, with a zero representing the most involvement and an eight the least (A.R. 88-89). According to the vocational expert, the Marker and Mail Clerk positions carry a marker of eight (the lowest level of involvement), while the Office Helper is a six (A.R. 88).

The ALJ next asked the vocational expert whether a hypothetical individual with all the same restrictions, but who is limited to sedentary work rather than light, would be able to perform any sedentary jobs (A.R. 89). The vocational expert identified available work as a Touch-Up Screener (DOT 726.684-110), with a DOT specific vocational preparation rating of 2 and an exertional level of sedentary, with a "conservative estimate in the national economy [of] anywhere from 8,000 to 8,100 of these jobs;" a Bench Hand (DOT 700.687-062), again with a DOT specific vocational preparation rating of 2 and an exertional level of sedentary, with a "conservative estimate in the national economy [of] anywhere from 4,000 to 4,100 of these jobs;" and Cashier II (DOT 211.462-010), again with a DOT specific vocational preparation rating of 2 but with an exertional level of light, with a "conservative estimate in the national economy [of] anywhere from 9,200 to 9,300 of these jobs" (A.R. 89-90).

Regarding the Cashier II position, the vocational expert indicated that, notwithstanding that the DOT categorizes the position as light, cashier level jobs exist that are performed at the sedentary level, such as working as a parking garage attendant or in a self-service gas station selling items such as candy,

cigarettes, and lottery tickets (A.R. 89-90). The ALJ did not ask, and the vocational expert did not testify (apart from noting that "[t]hey're not involved with stocking shelves"), regarding whether these positions require overhead reaching or would be consistent with an individual needing to sit and stand at will, or as to the DOT marker relating to the level of involvement with other people (A.R. 90).

In response to additional questioning, the vocational expert testified that, regardless of the exertional level, if an individual is off task more than fifteen percent of the time, he or she is unemployable (A.R. 90). Similarly, an individual who is consistently absent for an excused reason more than one day per month is unemployable (A.R. 91).

## III. The ALJ's Decision

The ALJ conducted the requisite five-step sequential analysis set forth in the regulations promulgated by the Social Security Administration ("SSA"). *See* 20 C.F.R. § 404.1520(a)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v). At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 20, 2021, through the date of the decision (A.R. 14). At the second step, he found that Plaintiff's severe impairments included "status post right left fracture with fasciotomy, and subsequent closure of fasciotomy (April 28, 2021); revision open reduction internal fixation for settling with augmentation with a medial plate (May 25, 2021); right leg/knee osteoarthritis; left shoulder mild insertional tendinopathy with no evidence of rotator cuff tear; obesity; depressive

disorder; anxiety disorder; post-traumatic stress disorder (PTSD)" (*id.*).[4] At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment (*id.*). The ALJ considered listing 1.18 in particular in regard to Plaintiff's lower extremity impairment but rejected it, finding that Plaintiff used an assistive device for less than twelve months following the horseback riding accident and was not using one at the time of the hearing (*id.*).[5] As for mental impairments, the ALJ found Plaintiff mildly limited in her ability to understand, remember, or apply information and to adapt or manage herself (A.R. 15). He found that she was moderately limited in her ability to interact with others and to concentrate, persist,

[4] Plaintiff faults the ALJ for not including "Attention Deficit Disorder, Chronic pain, weakness, and limited mobility following severe trauma, PFPS [i.e., patellofemoral pain syndrome], Major recurrent depressive disorder, prolonged grief disorder, Prolonged QT interval syndrome, and Symptomatic post traumatic AC joint arthrosis with distal clavicle osteolysis and heterotopic bone formation" (Dkt. No. 1-3, at 1). The court addresses Plaintiff's complaint about the omission of ADHD below but agrees with the Commissioner that any error in connection with the omission of the other alleged severe impairments at step two was harmless where the ALJ was required to consider all of Plaintiff's impairments, severe and non-severe, in determining his residual functional capacity. *Andrade v. Colvin*, No. 14-cv-12153-JGD, 2015 WL 5749446, at *6 (D. Mass. Sept. 30, 2015) (citing 20 C.F.R. § 404.1545(A)(2)). Additionally, the ALJ recognized four of the diagnoses (AC joint arthrosis, PFPS, prolonged grief disorder, and major recurrent depressive disorder) under alternate diagnoses, while three (chronic pain, weakness, and limited mobility) are symptoms, not medically diagnosed impairments.

[5] Plaintiff complains about the ALJ's finding that she used an assistive device for less than twelve months following her accident. However, there is substantial evidence to support the finding that Plaintiff was no longer using an assistive device by March 19, 2022 (A.R. 582), and certainly that she had ceased using an assistive device regularly by the time of the hearing (A.R. 690, 692). In addition, there was no evidence that she was unable to use both upper extremities, which is a requirement for the listing to apply.

or maintain pace (*id.*). Accordingly, Plaintiff did not meet the paragraph B criteria of two marked limitations or one extreme limitation (A.R. 14-15). She also did not meet the paragraph C criteria because the record contained no evidence of the existence of a mental disorder in the listing category of at least two years' duration and evidence of medical treatment, mental health therapy, psychosocial supports, or a highly structured setting that is ongoing and that diminished the symptoms and signs of her mental disorder, combined with marginal adjustment (A.R. 15-16).[6]

Before considering step four, the ALJ found that Plaintiff has the following residual functional capacity:

> [She can] perform light work as defined in 20 C.F.R. 404.1567(b) except she can occasionally lift and/or carry up to 20 pounds, and occasionally lift and/or carry up to 10 pounds. She can sit for up to 6 hours in an 8-hour workday, and stand and/or walk up to 4 hours in an 8-hour workday. She can climb ramps and stairs occasionally, and never climb ladders, ropes, or scaffolds. She can never balance as defined in the Selected Characteristics of Occupations of the DOT. She can stoop, kneel, crouch, and crawl occasionally. The claimant can occasionally reach overhead. She can handle frequently. She can have no exposure to hazards such as moving mechanical parts and high exposed places. She can have frequent interactions with supervisors and/or coworkers, and occasional interactions with the public. The claimant can carry out simple instructions (A.R. 16).

At step four, the ALJ determined that Plaintiff, if limited to the residual functional capacity provided, would be unable to perform her past relevant work as

[6] Plaintiff complains that she has carried most of her mental health diagnoses for more than two years' duration, but this is not supported by substantial evidence contained in the record.

a nurse (DOT 075.364-010) either as she actually performed it (heavy exertion) or as it is generally performed (medium exertion) (A.R. 26-27). Finally, at step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff could perform jobs found in significant numbers in the national economy and, therefore, Plaintiff was not disabled (A.R. 27). Specifically, the ALJ cited the jobs proposed by the vocational expert, including: Marker (light exertion, specific vocational preparation rating ("SVP") 2, DOT 209.587-034) with 80,000 jobs in the national economy; Mail Clerk (light exertion, SVP 2, DOT 209.687-026) with 12,000 jobs in the national economy; Office Helper (light exertion, SVP 2, DOT 239.567-010) with 13,000 jobs in the national economy; Touch-Up Screener (sedentary, SVP 2, DOT 726.684-110) with 8,000 jobs in the national economy; and Bench Hand (sedentary, SVP 2, DOT 700.687-062) with 4,000 jobs in the national economy (A.R. 27-28). Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act from April 20, 2021, through the date of the decision (A.R. 28).

## IV. Standard of Review

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review is limited to determining "'whether the [ALJ's] final decision is supported by substantial evidence and whether the correct legal standard was used.'" *Coskery v. Berryhill*, 892 F.3d 1, 3 (1st Cir. 2018) (quoting *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001)). The court reviews questions of

law de novo, *id*., but "the ALJ's findings [of fact] shall be conclusive if they are supported by substantial evidence, and must be upheld 'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion,' even if the record could also justify a different conclusion." *Applebee v. Berryhill*, 744 F. App'x 6, 6 (1st Cir. 2018) (per curiam) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222-23 (1st Cir. 1981)). "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." *Purdy v. Berryhill*, 887 F.3d 7, 13 (1st Cir. 2018) (quoting *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Applebee*, 744 F. App'x at 6. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

## V. Analysis

Plaintiff claims that the ALJ failed to properly evaluate the medical opinion evidence in her case and that his RFC is not supported by substantial evidence. The court agrees for the following reasons.

### A. Evaluation of Opinion Evidence

Social Security Ruling ("SSR") 96-8p directs that ALJs, during the RFC determination, "must always consider and address medical source opinions." SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996). "In order to determine what weight to assign a medical source opinion, the ALJ must consider the following factors: supportability, consistency, relationship, specialization, and other factors." *Harrison v. Saul*, No. Civil No. 20-10295-LTS, 2021 WL 1153028, at *5 (D. Mass. Mar. 26, 2021) (citing 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5)). "Supportability and consistency 'are the most important factors,' and the ALJ must 'explain how [he] considered' those factors 'for a medical source's medical opinions . . . in [a claimant's] determination or decision.'" *Vieira v. Bisignano*, No. 1:25-cv-12943-JEK, 2026 WL 2099031, at *2 (D. Mass. July 21, 2026) (quoting 20 C.F.R. § 404.1520c(b)(2)). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[]," the more persuasive that opinion will be. 20 C.F.R. § 404.1520c(c)(1). Likewise, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive" that opinion will be. *Id.* at § 404.1520c(c)(2). "A medical opinion without supporting evidence, or one that is inconsistent with evidence from other sources, [is] not . . . persuasive regardless of who made the medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5854 (Jan. 18, 2017).

Here, the ALJ had only the opinions of the state examiners to review, including the prior administrative medical findings of Drs. Hanze, McIntyre, Venkataraman, and Hom, as well as Dr. Stephenson's psychological report. Beginning with the physical medical opinions, the ALJ found the prior administrative findings of both Dr. Venkataraman and Dr. Hom persuasive in part but offered no explanation for why (A.R. 25). He noted that Drs. Venkataraman's and Hom's opinions supported the RFC he ultimately assessed without addressing any of the 404.1520c(c) factors, including supportability and consistency. He then reasoned that "additional records are consistent with additional limitations," and went on to incorporate these additional limitations (standing and/or walking only four hours in an eight-hour workday; never climbing ladders, ropes, or scaffolds; never balancing as defined in the Selected Characteristics of Occupations; only occasionally stooping and crouching; and frequently handling) based on Plaintiff's having an "antalgic gait at times but . . . not us[ing] an assistive device" as of the most recent records; having "no instability but . . . decreased strength 4+/5 to 4/5 to the left lower extremity;" and having a "positive impingement sign . . . , strength 4/5 . . . , and pain" of the left shoulder (A.R. 25). However, the ALJ's conclusion that the "[l]ater adduced evidence . . . is more consistent with greater limitations than" Drs. Venkataraman and Hom found did not excuse him from considering the § 404.1520c factors in deciding what weight to assign their opinions, which he used as a starting point for his RFC, and in articulating how he considered supportability and consistency factors.

In addition, Dr. Hom opined that Plaintiff should be limited to only occasional pushing or pulling with her right lower extremity (A.R. 115). The ALJ did not include this limitation in his RFC, and he offered no explanation for rejecting it. The ALJ's reason for this omission is particularly opaque given his finding that Plaintiff was more limited in her functionality vis-à-vis her right leg than Dr. Hom had opined. On remand, the ALJ must consider the 404.1520c(c) factors, articulate how he considered the supportability and consistency factors, and either adopt Dr. Hom's opinion or explain why he refused to adopt a push/pull limitation with Plaintiff's right leg.

As for the mental health medical opinions, the ALJ found Dr. Stephenson's opinion persuasive because it was supported by the results of the tests she administered that documented "claimant as cognitively intact and oriented," and scoring average on attention, memory, language, and reasoning subscales (A.R. 23-24, 820). He also found Dr. Stephenson's opinion supported by Plaintiff's reports of engaging in light chores, caring for her dog, and having friends with whom she socialized (A.R. 23). Finally, the ALJ determined that Dr. Stephenson's opinion was consistent with treatment notes from Novo, Craven, and Shumway showing that, while claimant was depressed, anxious and sad at times, and reported PTSD symptoms, she also had normal memory, intact cognition, a euthymic mood, good insight and judgment, and was calm and cooperative (*id.*).

The ALJ then turned to the opinions of Drs. Hanze and McIntyre. He found Dr. Hanze's opinion not persuasive because the doctor found no severe mental

health impairments, which was inconsistent with Dr. Hanze's own analysis and minimally supported (A.R. 24). The ALJ also found Dr. Hanze's opinion inconsistent with later adduced evidence, including Dr. Stephenson's and Dr. McIntyre's opinions (*id.*). As for Dr. McIntyre, the ALJ found his opinions persuasive in part (*id.*). According to the ALJ, Dr. McIntyre's opinion was "fairly consistent" with Novo's, Craven's, and Shumway's treatment records and consistent with Dr. Stephenson's opinion that Plaintiff was capable of understanding and following directions, maintaining attention, and getting along with others (*id.*). But the ALJ found Dr. McIntyre's opinion only "persuasive in part because some of the language used in the prior administrative medical findings—such as 'may have difficulty' and 'respond appropriately'—is not vocationally defined, and thus, does not adequately articulate the limitation for use in a residual functional capacity assessment" (A.R. 24). As a result, the ALJ used "more specific, vocationally defined, and policy compliant language to express the moderate limitations arising from [Plaintiff's] mental impairments," finding that she could have frequent interactions with supervisors and coworkers but only occasional interactions with the public, and could carry out simple instructions (A.R. 24).[7]

Thus, in contrast to the ALJ's consideration of the physical medical opinions, he did explain his consideration of the supportability and consistency factors with regard to the opinions of Drs. Stephenson, Hanze, and McIntrye. Moreover, while

---

[7] Frequent is defined as from one-third to two-thirds of the workday, while occasional is from very little up to one-third of the workday. *See* SSR-83-10, 1983 WL 31251, at *5-6.

the ALJ did not explain why he found Plaintiff's ability to interact with the public to be more limited than her ability to interact with supervisors when Dr. McIntyre opined the opposite, this discrepancy does not amount to error. The ALJ's assessment that Plaintiff is limited to frequent interactions with supervisors and coworkers but only occasional interactions with the public is not in conflict with Dr. McIntyre's opinion, which the ALJ found persuasive in part, and it is consistent with Dr. Stephenson's opinion, which he found persuasive.

B. Residual Functional Capacity

A claimant's residual functional capacity "is the most [she] can still do despite [her] limitations," and it is determined based on all relevant evidence in the claimant's case record. 20 C.F.R. § 416.945. "As with other factual findings, the Court defers to the ALJ as to his RFC determination 'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.'" *Joseph v. Bisignano*, Civil Action No. 24-12670-BEM, 2025 WL 2673334, at *3 (D. Mass. June 20, 2025) (quoting *Rodriguez Pagan v. Sec'y of Health & Hum. Servs.*, 819 F.2d 1, 3 (1st Cir. 1987)). Here, the ALJ based his physical RFC partially on the opinions of Drs. Venkataraman and Hom, which he found "persuasive in part," but he imposed a more restrictive RFC based on "[l]ater adduced evidence [that he determined was] consistent with greater limitations than these sources . . . found" (A.R. 25).

"An ALJ may rely on the opinions of agency nonexamining consultants who have not seen later-submitted evidence when that evidence does not 'call into

question their conclusions.'" *Benjamin B. v. Berryhill*, No. 1:17-cv-00423-DBH, 2018 WL 4896716, at *4 (D. Me. Oct. 8, 2018), *report and recommendation adopted sub nom. Benjamin B. v. Soc. Sec. Admin. Comm'r*, No. 1:17-cv-00423-LEW, 2018 WL 5815522 (D. Me. Nov. 6, 2018) (quoting *Anderson v. Astrue*, No. 1:11-cv-476-DBH, 2012 WL 5256294, at *4 (D. Me. Sept. 27, 2012) (rec. dec., *aff'd* Oct. 23, 2012), *aff'd*, No. 13-1001 (1st Cir. June 7, 2013)). This is not what occurred here. While not in so many words, the ALJ acknowledged that the later-adduced evidence called into question Drs. Venkataraman's and Hom's opinions because it supported a more restrictive RFC than they had opined. This is because the later adduced evidence was not simply cumulative of and consistent with the evidence that Drs. Venkataraman and Hom reviewed when they offered their opinions. For example, when Dr. Hom conducted her analysis on December 13, 2023, she did not have the benefit of Dr. Burns' March 18, 2024, record or Fields' October 3, 2024, record. In explaining the basis for her December 13, 2023, opinion, Dr. Hom noted that Plaintiff's gait was normal on December 1, 2023, that she only had "some pain" when ambulating, and that her CT and lab results were normal with no evidence of infection (A.R. 116). However, Dr. Burns noted on March 18, 2024, that Plaintiff "still ha[d] a moderate right antalgic gait," and that Plaintiff's symptoms could still represent a low-grade infection of the metal plate in her leg (A.R. 1018). And Fields' examination of Plaintiff on October 3, 2024, suggested that "daily activities were continuing to provoke pain" (A.R. 1091).

Under these circumstances, the ALJ was not entitled to rely on the opinions of Drs. Venkataraman or Hom in formulating his RFC. Of course, the ALJ attempted to address the later-adduced evidence himself by assessing a more restrictive RFC but, by necessity given that no medical source considered this evidence in formulating an opinion, it was based on the ALJ's own interpretation of the evidence for which he, as a lay person, was not qualified. *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996). This was error. On remand, the ALJ must solicit an RFC assessment by a medical source whose review includes this later-adduced evidence.

Plaintiff also complains that the ALJ erred in concluding that there was no evidence of a rotator cuff tear in her left shoulder (A.R. 14) when her November 7, 2024, MRI revealed a "new linear [delaminating-type] partial tear of the supraspinatus" (A.R. 1023). The Commissioner argues in a footnote that any error is harmless because the ALJ acknowledged both this November 7, 2024, MRI, as well as a December 7, 2023, MRI which showed no evidence of a rotator cuff tear (Dkt. No. 26, at 3 n.2). The court disagrees. These two MRIs do not reflect an inconsistency in the record that it was the ALJ's responsibility to resolve but instead appear to show that Plaintiff had no tear on December 7, 2023, and a "new" tear on November 7, 2024. In addition, when Dr. Venkataraman reviewed Plaintiff's records on January 16, 2023, Plaintiff had yet to experience any impairment relative to her left shoulder, which did not appear in the record until seven months later at her August 4, 2023, appointment with Dr. Burns (A.R. 95-102, 835).

Similarly, Dr. Hom conducted her reconsideration evaluation on December 13, 2023, which was not only before the MRI revealing the rotator cuff tear, but also before Plaintiff's January 17, 2024, left shoulder SAD/DCE procedure, which did not resolve her pain (A.R. 114-19, 998-1001, 1010, 1013). According to the Commissioner, the error is harmless because the ALJ limited Plaintiff to occasional overhead reaching (A.R. 16). But this is the same limitation that Dr. Hom opined before both the MRI showing the partial rotator cuff tear and the unsuccessful SAD/DCE procedure (A.R. 115). Thus, the record is devoid of medical opinion as to whether this later evidence would support greater limitations than occasional overhead reaching. Once again, the ALJ, as a lay person, was not qualified to interpret this raw medical data. *Manso-Pizarro*, 76 F.3d at 17. On remand, the ALJ must solicit an RFC assessment by a medical source whose review includes this later-adduced evidence.

The analysis regarding Plaintiff's mental RFC differs. In considering the paragraph B criteria at step three, the ALJ found Plaintiff mildly limited in her ability to understand, remember, and apply information, as well as to adapt and manage herself, and moderately limited in her ability to interact with others and to concentrate, persist, and maintain pace (A.R. 15). This analysis matched exactly Dr. McIntyre's consideration of the paragraph B criteria (A.R. 113).[8] In assessing Plaintiff's RFC before proceeding to steps four and five, the ALJ found that Plaintiff

[8] The ALJ found Dr. Hanze's opinion not persuasive, and so the court does not address it here.

can have frequent interactions with supervisors and coworkers and occasional interactions with the public and can carry out simple instructions (A.R. 16). In all but one area, the ALJ was adopting limitations found by Dr. McIntyre. Where Dr. McIntyre opined that Plaintiff was moderately limited in her ability to understand and remember and to carry out detailed instructions, the ALJ limited Plaintiff to simple instructions (A.R. 117). Where Dr. McIntyre opined that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, the ALJ limited Plaintiff to frequent interactions with supervisors and coworkers and occasional interactions with the public (A.R. 118). The ALJ did not adopt a limitation corresponding to Dr. McIntyre's opinion that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, but he noted that Dr. Stephenson opined that Plaintiff was capable of maintaining attention based on Plaintiff's average performance on the attention subscale and that no mental health examinations documented Plaintiff's claim that she had trouble holding conversations (A.R. 15, 26). Thus, even if this court would reach a different conclusion, there is substantial evidence in the record to support the ALJ's mental RFC assessment of Plaintiff.[9] *Applebee*, 744 F. App'x at 6.

---

[9] The court acknowledges Plaintiff's complaint that the ALJ did not find ADHD to be a severe impairment at step two. Setting aside the question of whether the ALJ should have done so, the Commissioner is correct that even if the ALJ erred at step two, any error was harmless where he considered Plaintiff's alleged difficulty paying attention, concentrating, and holding conversations but found them not

## VI. Conclusion

For the foregoing reasons, the court DENIES the Commissioner's motion to affirm (Dkt. No. 25), GRANTS Plaintiff's motion (Dkt. No. 21), vacates the ALJ's decision, and remands the matter for further administrative proceedings consistent with this opinion.

Date: September 30, 2026

/s/ Christopher L. Morgan
CHRISTOPHER L. MORGAN
U.S. MAGISTRATE JUDGE

---

entirely consistent with the medical evidence and other substantial evidence in the record and where that finding is supporting by substantial evidence, as it is here. *See Perez v. Astrue*, Civil Action No. 11-30074-KPS, 2011 WL 6132547, at *4 (D. Mass. Dec. 7, 2011) ("Any error [at step two] was harmless, however, as the ALJ explicitly considered 'all symptoms,' both severe and non-severe, in assessing Plaintiff's residual functional capacity and there is no indication that the ALJ failed to consider the cumulative effect of these impairments.").